1                IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                          AT CHARLESTON

3    _____
                                         :
4    EQT PRODUCTION COMPANY,             :
                                         :  CIVIL ACTION
5                   Plaintiff,           :  NO. 2:16-cv-00290
                                         :
6                 -vs-                   :
                                         :
7    MATTHEW D. WENDER, in his           :
     official capacity as President      :
8    of the County Commission of         :
     Fayette County, West Virginia,      :
9    DENISE A. SCALPH,in her official    :
     capacity as a Commissioner of       :
10   the County Commission of            :
     Fayette County, West Virginia,      :
11   and JOHN H. LOPEZ, in his           :
     official capacity as a              :
12   Commissioner of the County          :
     Commission of Fayette County,       :
13   West Virginia,                      :
                      Defendants.        :
14   _____

15                    **TRANSCRIPT OF HEARING**
          **BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
16               **UNITED STATES DISTRICT JUDGE**
                      **JANUARY 19, 2016**

17

18   **APPEARANCES:**
     **For the Plaintiff:**         **TIMOTHY M. MILLER, ESQ.**
19                                  **CHRISTOPHER B. POWER, ESQ.**
                                    Babst Calland
20                                  Suite 1000
                                    300 Summers Street
21                                  Charleston, WV 25301

22

23   **For the Defendants:**       **THOMAS A. RIST, ESQ.**
                                    Rist Law Offices
24                                  103 Fayette Avenue
                                    Fayetteville, WV 25840

25

1    **APPEARANCES CONTINUED**
     **For the Defendants:**          **LARRY E. HARRAH, II, ESQ.**
2                                     Fayette County Prosecuting
                                      Attorney's Office
3                                     108 East Maple Avenue
                                      Fayetteville, WV 25840
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20            Proceedings recorded by mechanical stenography,
         transcript produced by computer.
21         _____
                   CATHERINE L. SCHUTTE-STANT, RMR, CRR
22                  Federal Official Court Reporter
                     300 Virginia Street, East
23                            Room 6009
                       Charleston, WV 25301
24                       (304) 347-3151

25

```
 1                P R O C E E D I N G S            10:05 a.m.

 2            THE CLERK:  All rise.

 3            THE COURT:  Good morning.  Please be seated.

 4            THE CLERK:  The case before the Court is EQT

 5  Production Company versus Matthew Wender, Denise Scalph, and

 6  John Lopez, each in his or her official capacity as a

 7  Commissioner of the Fayette County Commission, Case Number

 8  16-cv-00290.

 9       Will counsel please state your name and appearances for

10  the record?

11            MR. MILLER:  Your Honor, Tim Miller and

12  Christopher Power on behalf of the plaintiff, EQT Production

13  Corporation.  We have a corporate representative, Mr. Joey

14  Stumbo, also present in the courtroom with us.

15            THE COURT:  Thank you.

16            MR. RIST:  Good morning, Your Honor.  Tom Rist and

17  Prosecutor Larry Harrah from Fayette County.  We represent

18  the defendants in this case.  And Matthew Wender, one of the

19  defendants, is seated at counsel table with us.

20            THE COURT:  Thank you.  This matter is before the

21  Court on the motion for a temporary restraining order.

22       The Court, I will tell you at the outset, would expect

23  if the temporary retraining order were granted, that we

24  would grant it for a period of 14 days, in accordance with

25  the rule.  And then, either at that point, the preliminary
```

1    injunction request would be heard or the temporary

2    restraining order would, by agreement of the parties, be

3    continued for another seven days, so that the preliminary

4    injunction hearing itself would occur on February 11th.

5         And so I wanted you to know that in advance, that even

6    though the Court has directed the plaintiffs to provide

7    notice to the defendants, that this will proceed,

8    nevertheless, as though it is a temporary restraining order

9    request at this juncture.

10        And with that, I would ask the parties whether or not

11   you have any comments that you would wish to make before the

12   Court hears that which you propose to present?

13             MR. MILLER:  Your Honor, on behalf of the

14   plaintiff, if the Court desires -- we weren't sure whether

15   you were going to take this up as a temporary restraining

16   order or a preliminary injunction at this time.  We have a

17   witness here if the Court needed additional factual record

18   upon which to make a finding.  The witness would

19   basically -- as a proffer, I would tell you would merely

20   testify that EQT operates 204 gas wells located within

21   Fayette County, West Virginia.  They also have one

22   underground injection control well they operate in Fayette

23   County, West Virginia.

24        And I would indicate to you that at those gas wells,

25   producing gas wells, typically there is a tank in order to

1    collect water and other produced fluids that are a part of

2    the natural process of producing a gas well.  So there is

3    fluid stored in those tanks at those producing gas well

4    sites until the tanks reach a certain level where that fluid

5    has to be removed and hauled and disposed of.  And, in this

6    case, disposed of in the underground injection control well

7    operated by EQT.

8         So in terms of our standing, if you will, he is here if

9    the Court needed a factual record that we actually own and

10   operate gas wells, producing gas wells, how it would be

11   affected by this ordinance as well as the underground

12   injection control well that would be affected by this

13   ordinance.

14        Given that the ban is total and complete on the

15   storage, transportation, treatment, et cetera, any broadly

16   defined natural gas waste or oil waste, it would essentially

17   require it to be in compliance with this ordinance, EQT

18   would have to shut-in or stop production on all 204 of those

19   gas wells, producing gas wells, so that no fluid would be

20   collected and stored onsite in those tanks, and it would

21   also require the shutdown of the underground injection

22   control well.

23        So I think on that basis we would be able to make or

24   have made, I believe, given the verified complaint filed in

25   this action, a sufficient factual record that the Court can

```
 1    make a finding that we, in fact, would have an injury in

 2    fact here if this ordinance is taken effect, it would very

 3    much impact the operations of EQT in Fayette County, West

 4    Virginia.

 5         For that reason, we have requested temporary

 6    restraining order relief.  If you'd like me to go through

 7    our counts and legal arguments, fine.

 8         If the Court would prefer to allow the parties to rely

 9    on their briefing, I can do that as well.  It's whatever the

10    Court's pleasure.

11              THE COURT:  Let me ask you to what extent the UIC

12    is used for wells outside the county?

13              MR. MILLER:  It is.  There are surrounding

14    counties, nearby counties that are part of the same

15    district, what EQT calls the Madison District, basically

16    Jackson, Kanawha, Boone, Fayette, in that area.  And the UIC

17    well does collect waste from various gas producing wells in

18    that location.

19              THE COURT:  What's the estimated number of wells,

20    aside from -- I believe you said 204 in Fayette County?

21              MR. MILLER:  That would be correct.

22              THE COURT:  -- that would be used in the UIC?

23              MR. MILLER:  If you'd let me check, Your Honor,

24    with the representative.

25         (Pause.)
```

1        (An off-the-record discussion was held between Attorney

2   Timothy Miller and Mr. Stumbo.)

3        MR. MILLER:  Your Honor, we did actually check on

4   this.  Approximately 500 wells in that region, 204 of which

5   are located in Fayette County.

6        THE COURT:  And so another near 300 would be

7   affected, as well?

8        MR. MILLER:  They would, Your Honor.  And the

9   only --

10        THE COURT:  And those, of course, we're speaking

11   of producing oil and gas wells?

12        MR. MILLER:  Yes, those are producing wells,

13   correct.  And these are conventional wells, vertical wells.

14        THE COURT:  Do I understand you to say that if the

15   plaintiff were not afforded this relief, it would

16   immediately have to cease its oil and gas production from

17   those 500 wells?

18        MR. MILLER:  To be in compliance with the

19   ordinance, I believe we'd have to do something because, as

20   the gas is produced, there's fluid associated with it, which

21   is separated at the wellhead and goes into these tanks.  And

22   as we read this ordinance, it would ban any type of storage

23   or collection of any natural gas waste, including water and

24   brine, which is primarily what is collected in these tanks.

25        THE COURT:  I think your position is that it's not

1    just that the UIC would be closed; you couldn't produce at

2    all, because you can't create waste?

3              MR. MILLER:  Correct.

4              THE COURT:  How many employees would be laid off

5    as a result?

6              MR. MILLER:  I don't know that they'd be laid off,

7    Your Honor, immediately.  We'd obviously be seeking relief

8    if the ban were in effect.  But we have approximately -- how

9    many employees in the region, in the Madison region?

10        (Off-the-record discussion was held between Attorney

11   Timothy Miller and Mr. Stumbo.)

12             MR. MILLER:  You would have eight employees whose

13   jobs primarily as well tenders to go to these well sites for

14   purposes of checking these tanks and other operations at

15   each producing gas well site, they would obviously have no

16   particular duties at that point, and the company would be

17   faced with a situation of either laying them off or --

18             THE COURT:  As a practical matter, each of these

19   wells pretty well operates on its own?

20             MR. MILLER:  Correct.

21             THE COURT:  And somebody has to be checking it

22   from time to time?

23             MR. MILLER:  Correct.  And most wells are checked

24   at least once a month, depending on the particular well,

25   sometimes much more frequently than once a month.

1          THE COURT:  Thank you.  If nothing further, Mr.

2     Miller, let me call on the defendants.

3       And what I would really ask you initially is whether or

4     not you take exception to any of the facts that are set

5     forth in the Complaint, that is, as distinguished from

6     whether or not the ordinance is a lawful law?

7          MR. RIST:  We do, Your Honor.  And I think the --

8     obviously, it's one of the weaknesses of coming in and

9     responding so quickly to a -- to basically a TRO or a

10    request for a temporary restraining order is that we don't

11    have time to brief the Court and let the Court know where

12    our position is on those issues.  But one of the issues

13    that's been brought up by the gentlemen this morning is

14    this -- the fact that they wouldn't be able to produce oil

15    or gas, which I think is outside the scope of what the

16    ordinance itself was written to do.

17      The ordinance itself under Section 1 states, "This

18    prohibition shall specifically apply to disposal injection

19    wells."

20      I think the point of the action that was taken by the

21    County Commission was to stop the injection into that, into

22    the UIC wells in Fayette County because of the risk that it

23    poses to our drinking water.  There's only two UIC wells

24    that we know of in Fayette County or that we've discovered

25    or have come out.  And so that was really the focus of this

1    ordinance that was issued.

2         And in the request for an injunction in this case, one

3    of the weaknesses of looking at that as, hey, we've got 200

4    wells that are producing oil and gas, we'll have to shut

5    those down.  Well, that's not -- I don't think that that's

6    true under the facts of this case.  And as this Court knows

7    with the four-part test in issuing an injunction, the

8    plaintiff has to show that they are going suffer irreparable

9    harm without relief.

10        Well, no one has filed a case against EQT.  The county

11   commission hasn't sent them a cease and desist order.  None

12   of that has been done.  It's just, hey, this might happen.

13   Which I think is different than irreparable harm -- that

14   they're likely to suffer irreparable harm without this.

15        And I think until someone does that or some action is

16   taken against them, that they're not really risking

17   anything.  They can keep producing at those wells.  There's

18   no issue with that I've seen under this ordinance.  That

19   would be the argument that we would make.

20        As far as the UIC well having to be shut down, that

21   would fall under the ordinance as written, Your Honor.

22        So that would be, I think, an issue that would have to

23   come up or that we'd have to deal with in this hearing or at

24   a later hearing.

25        The other thing I would bring the Court's attention to,

```
 1    a second case was filed in federal court in this district.

 2    Our understanding is it hasn't been assigned to a judge yet.

 3    But that was filed by Danny Webb Construction or Danny Webb.

 4    I believe the attorney for Mr. Webb is sitting in the back

 5    of the courtroom.  He's from Bowles Rice.  And it could be

 6    that when we're dealing with these issues, we might want to

 7    have these cases consolidated, because the complaints are

 8    very similar.  We're dealing with the same issues and we're

 9    going to be bringing these up at a later day.

10              THE COURT:  When and where was that case filed?

11              MR. RIST:  That was filed on Friday in the

12    Southern District of West Virginia.

13              THE COURT:  Where?

14              MR. RIST:  Here in Charleston.

15              THE COURT:  And what's the style of the case?

16              MR. RIST:  It's Danny Webb -- I don't know the

17    exact entity name, but it's Danny Webb versus the three

18    defendants that are in this case.  They may have named the

19    county commission as an entity as well, but I don't have it

20    sitting in front of me.

21              THE COURT:  Thank you.

22              MR. RIST:  You're welcome.

23              THE COURT:  And, Mr. Miller?

24              MR. MILLER:  Yes, Your Honor.  We disagree in that

25    the -- if the argument is somehow this does not apply to
```

1   producing gas wells and tanks where natural gas waste are

2   collected and stored, I would point out that in the

3   ordinance of Section 1, paragraphs 5 and 6, Paragraph Number

4   5, bans the sale, acquisition, storage, handling, treatment

5   and/or processing of natural gas waste or oil waste within

6   Fayette County.  Period.

7        So the ordinance is very broad and applies to basically

8   any storage or handling of anything that falls within the

9   definition of natural gas waste or oil waste.  And that

10  definition clearly says it includes water, brine, or any

11  other fluids associated with the production of natural gas.

12       So I disagree with the assertion that this only -- this

13  ordinance, as drafted, only applies to UIC wells.  It's very

14  broad in its application.  So I do take issue with that

15  argument.

16            THE COURT:  Thank you.  Let me ask whether or not,

17  Mr. Rist, it is the case that the ordinance as set forth

18  here is accurately stated, and that it does include the

19  handling and treatment of those same substances, so that it

20  would relate to the production of oil and gas as well?

21            MR. RIST:  The -- what's being proffered as what's

22  in the ordinance is correct, Your Honor.  It's the reading

23  of the ordinance where we're disagreeing.  But I have no

24  issue with what they've presented as far as what the

25  ordinance says.

1          I do think they're looking at it a little more broadly

2     than what it was designed to do.  But, yes, that's correct,

3     what he said.

4          MR. MILLER:  Your Honor, and I had one final point

5     I forgot to mention as well.  He mentioned there's no

6     irreparable harm.

7          This is a criminal and civil statute.  It indicates for

8     every day somebody operates in violation, there is a penalty

9     up to a total of five-million dollars, as well as it

10    subjects the employees of EQT to criminal penalties,

11    including up to one year in prison.  So to the extent that

12    we have a Hobson's choice to either willfully ignore an

13    ordinance which is passed and risk criminal civil penalties

14    or comply with the law, we're faced with a dilemma.

15         It's also a valuable property right, which we're going

16    to be denied.

17         So we think, clearly, as the case law we cited to you,

18    including there's a case in the Northern District, *SWN*

19    *Production versus Edge*, decided by Judge Stamp last week,

20    affirming that under West Virginia law, the denial of

21    operating rights under an oil and gas lease is a valuable

22    property right.  And it, it is -- is irreparable and can be

23    cured by equity -- inequity by injunctive relief.

24         So we think the West Virginia and federal case law

25    would very clearly hold any type of damage to the property

1   rights of an operating oil and gas lease which prohibits you

2   from enjoying those real property rights is in fact itself

3   by definition irreparable harm.

4           THE COURT:  Thank you.  Anything further on that

5   matter, Mr. Rist?

6           MR. RIST:  Well, Your Honor, I'm sitting beside

7   the prosecuting attorney of Fayette County.  Surely they

8   could contact them to deal with whether or not there would

9   be an issue with running those gas wells.

10      As far as the balance of harms go, the reason that this

11   ordinance was passed was to protect our water supply and to

12   shut down the two UIC wells.  You know, that's really what

13   we're dealing with in this case.

14      The balance of harms on our side of it, there is

15   40-some-thousand people that drink water off the water

16   system that's downstream from at least the Danny Webb well

17   that's being dealt with in the other case.  That's the risk

18   that we're looking at.

19      If the Court were to say, well, when balancing these

20   two against each other, you're going to lose a property

21   right.

22      Well, is it a property right to be able to drink clean

23   water out of your faucet?  Charleston knows that.

24      And so I would think that the balance of harms here is

25   not so clearcut and easily swayed to the side of the

1    plaintiff.

2              THE COURT:  Thank you.  Would you care to respond

3    to that, Mr. Miller?

4              MR. MILLER:  Your Honor, the fact that the

5    prosecutor is here and he might use some prosecutorial

6    discretion as to whether to indict or not is not -- is

7    little comfort to EQT.  Which the prosecutor could change

8    his mind a year from now and we'd be facing a

9    five-million-dollar fine or the imprisonment of employees

10   who were working at these well sites or Mr. Stumbo here.

11        So I think clearly the fact that maybe the prosecutor

12   might interpret the ordinance in a less restrictive fashion

13   does not cure the fact that the ordinance on its face

14   broadly prohibits the very property rights of producing oil

15   and gas in operating the UIC well.

16        So I think facially the statute or ordinance on its

17   face is clearly preempted under the Oil and Gas Act, which

18   does not have any savings clause reserving to municipalities

19   and commissions any authority to regulate oil and gas

20   operations.  There's no savings clause which saves them the

21   right.

22        It clearly preempts this field, the Oil and Gas Act,

23   Chapter 22, Article 6 of the West Virginia Code, and

24   subsequent articles.

25        So, clearly, the -- I don't think that solves our

1    problem, the fact the prosecutor today isn't going to file

2    for indictment or a cease and desist order does not cure the

3    fact the ordinance on its face is facially defective, is

4    unconstitutional or illegal.

5         The preemption ordinance, as well as the Federal Safe

6    Drinking Water Act, I think it's clear, as well, this UIC

7    Program -- if we focus not just on the producing wells but

8    under UIC wells, it's clearly one that is regulated under

9    the Safe Drinking Water Act.  The federal statute which

10   delegated to the state DEP certain abilities to regulate the

11   operations of this UIC well.  We do have a permit from the

12   West Virginia Department of Environmental Protection to

13   operate this well.

14        Maybe we can tender that as an exhibit.  I know we

15   recited it in our pleadings, Your Honor, that we had a

16   permit, but we didn't actually attach a copy of it to the

17   pleadings.

18        If the Court would allow me, I would just tender it as

19   an exhibit at this time.

20             THE COURT:  You may present it, if you wish,

21   but -- yes, hand it to counsel for the defendant, if you

22   would.

23             MR. MILLER:  So in terms of the irreparable harm

24   argument, Your Honor, it clearly would negate what the state

25   of West Virginia has allowed by this very permit I've

1      presented to you, the operation of the UIC well.

2           So we think in terms of what the interpretation of the

3      statute would be, I think it was conceded that the statute

4      at the very least is intended to ban and stop the operation

5      of two UIC wells in the county, one of which is owned and

6      operated by EQT.

7           So clearly it would be inconsistent, in conflict with

8      the Federal Safe Drinking Water Act, UIC Program; it would

9      conflict with our state permit for the DEP for operating the

10     UIC well, and basically would contradict completely the

11     DEP's authority to regulate the operations of the UIC well.

12          THE COURT:  Thank you.  You may want to respond to

13     that, Mr. Rist, but I want to ask Mr. Miller another

14     question first, and you can respond to both at the same

15     time.

16          Is there any authority on a matter of this nature

17     before any court in West Virginia other than, perhaps, in

18     the Morgantown City case?

19          MR. MILLER:  The Morgantown City case is the only

20     one I'm aware of, Your Honor, that issued a written opinion

21     on the issue which held that the efforts to ban fracking and

22     drilling within the city confines was, in fact, preempted by

23     the Oil and Gas Act.

24          I'm not aware of any other authority, written

25     authority, certainly not from the state supreme court, and

1     I'm not aware of any from any other circuit courts.

2              THE COURT:  Thank you.

3         And, Mr. Rist.

4              MR. RIST:  On that question, I'm also not aware of

5     any other authority, Your Honor.

6         On the previous issue with what counsel was saying on

7     the, on the Safe Drinking Water Act, there is actually a

8     savings clause in there, and counsel placed that in their

9     memorandum of law that was attached to this motion, that

10    does say that the local authorities can adopt and enforce

11    law or regulation respecting drinking water.

12        But I think one of the other issues that we're dealing

13    with here is that this is a state implemented permit.  That

14    was what was tendered to the Court.  This permit has -- was

15    granted by the West Virginia DEP.  It's not sent out by the

16    EPA.  And I do think that we're going to have to flesh out

17    the issue as to whether or not that is a federal issue and

18    that this falls under the Safe Drinking Water Act or if

19    we're dealing with just looking at the laws on the issuance

20    of the UIC permit by the West Virginia DEP under the West

21    Virginia Code.  So there could be an issue with that.  I'm,

22    frankly, not able to present that today.  I think that would

23    have to be something that we would bring up during a later

24    hearing in this case.

25             THE COURT:  All right.  Just one moment.

1          I'll ask you, finally, do the parties have

2     anything further to present at this time?

3          MR. MILLER:  No, Your Honor, unless you'd like to

4     hear from the witness to describe to you the number of wells

5     which we operate, which I've already proffered to the Court.

6          MR. RIST:  And I don't have any objection to the

7     proffer that was made.  I believe that to be true.

8          I will tell the Court that I made a mistake in

9     something I said earlier.  I forgot, Danny Webb actually has

10    two UIC wells.  I don't know that it matters, but I want to

11    make sure that we're clear on that.  And so we think --

12    there's three that we know of, there may be four UIC wells

13    in Fayette County.  But there's three, if you're dealing

14    with this party and the other party that we know have come

15    forward, Your Honor.

16          THE COURT:  Thank you.  I would ask the parties

17    what probably was already evident, but is this the first

18    such ordinance of this kind by any county in the state of

19    West Virginia so far as you are aware?

20          MR. RIST:  It is, as far as we know, Your Honor.

21          MR. MILLER:  It is, Your Honor.

22          THE COURT:  Thank you.

23          The Court, for purposes of the temporary

24    restraining order only, accepts the factual statement set

25    forth in the Complaint.  Based thereon, the Court finds that

1    the plaintiff is subject to irreparable harm were temporary

2    restraining relief not granted.

3         The Court further finds that, in view of the

4    comprehensive nature of the West Virginia Oil and Gas Act

5    and that of the Federal Safe Drinking Water Act, that there

6    is a likelihood of success on the merits by the plaintiff in

7    this matter, and that, taking into account the public

8    interest, the Court finds that an injunction at this stage

9    is in the public interest, that the balance of equities tip

10   in favor of the plaintiff, and the Court accordingly awards

11   the temporary restraining order relief.  Subject, however,

12   to the posting of adequate security.

13        And at this point, I would hear the parties on that

14   issue as to what it should be.

15             MR. MILLER:  Your Honor, from the standpoint of

16   the plaintiff, at this point, we don't know of any financial

17   or monetary harm that would occur to the Commission by the

18   granting of this temporary restraining order and/or

19   preliminary injunction.  As was conceded at this point, the

20   prosecutor apparently doesn't intend to issue any cease and

21   desist orders, so I don't see where there is any immediate

22   and irreparable harm they are going to suffer by the

23   granting of the TRO.  I think, therefore, for that reason, a

24   nominal bond is all that would be required in this case.

25   And by that, I am suggesting $500 or some nominal amount be

1    posted as bond.

2             MR. RIST:  Your Honor, I, frankly, agree.  I don't

3    know that a huge bond needs to be posted.  If it's something

4    nominal, that's fine.

5             THE COURT:  The Court will direct the posting of a

6    $10,000 bond.  And I take it that that's something that

7    could be done immediately?

8             MR. MILLER:  Yes, Your Honor.  Very short notice,

9    we can do that.

10            THE COURT:  The Court issues the temporary

11   restraining order for a period of 14 days, as I've

12   indicated.  As a consequence, the next hearing in the matter

13   will be scheduled for February 4th, at 10:00 a.m.

14       I'm going to suggest this to the parties, that you

15   confer and see if you can't agree on two things:

16       One, that the temporary restraining order be continued

17   for a further week, to February 11th at 10:00 a.m.; and,

18   two, that you undertake to stipulate all facts, to the

19   extent you can, in order to save substantial effort and time

20   at the hearing.

21       I would expect that the parties ought to be able to

22   stipulate to most everything as set forth in the Complaint

23   by agreement insofar as those are factual matters.  The law

24   matter is quite different, and the parties, if need be, will

25   be given an opportunity to proffer their brief once we have

1    reached a point where the matter is heard on preliminary

2    injunction and has been taken under advisement by the Court.

3        I would welcome, however, any briefing that you might

4    want to do in advance of that.

5        And so, having in mind that basically we first need to

6    establish the facts and that you likely will be able to

7    stipulate to much of them, I'm wondering whether or not it

8    would be feasible for counsel to, within the next 10 days,

9    have worked up a stipulation of facts, and then, on the

10   basis of that, any briefing that could be done to follow

11   immediately.

12       Let me ask from your own schedules whether or not it's

13   feasible for you to do that?

14            MR. MILLER:  I believe it is for the plaintiff,

15   Your Honor, yes.

16            MR. RIST:  It's also feasible to us, Your Honor.

17   And I'll just let the Court know, we're fine with the TRO

18   continuing through the February 11th hearing.  We're not

19   going to have an issue with that.  We'll agree with that.

20            THE COURT:  Well, that will give us a little more

21   time then for briefing beforehand, which I believe will

22   probably be valuable in that I suspect you're going to be

23   able to agree pretty much on what the facts are.  And in the

24   final analysis, it simply comes down to whether or not the

25   ordinance is a lawful act.

```
 1          So first with respect to the 10 days for stipulation,

 2     is that feasible?

 3               MR. RIST:  Yes, Your Honor.

 4               MR. MILLER:  Yes, Your Honor.

 5               THE COURT:  When you've reached that stipulation

 6     then, I'll ask you to file it with the Court, and briefing

 7     can proceed on the basis of it.  Insofar as the, as the

 8     briefing is concerned, I take it that the appropriate thing

 9     would be for the plaintiff to file the first brief.  And how

10     much time after that 10 days, after that stipulation is

11     arrived at, do you need for that purpose, do you believe,

12     Mr. Miller?

13               MR. MILLER:  Three days will be fine, Your Honor.

14               THE COURT:  How long?

15               MR. MILLER:  Three days.

16               THE COURT:  All right.  And so with that coming in

17     in three days, is another week enough for you, Mr. Rist?

18               MR. RIST:  Yes, Your Honor, that's adequate.

19               THE COURT:  And that takes care of 10 days of the

20     time.  And I believe that leaves us with another three days

21     or so in which you could file a reply.

22          In the meantime, I understand that the parties to be in

23     agreement that the temporary restraining order could be

24     continued for another seven days to February 11th, at

25     10 o'clock?
```

1            MR. RIST:  Yes, Your Honor, that's correct.

2            MR. MILLER:  Yes, Your Honor.

3            THE COURT:  I probably should say, throughout the

4    entirety of that day would probably be a better thing to

5    say, and that's the way it will be framed.

6        And so with that, I would ask the parties whether or

7    not you have anything further at this time?

8            MR. MILLER:  Nothing further, Your Honor.

9            MR. RIST:  Your Honor, I think I should clarify

10   the, as far as the scope of the restraining order, in the

11   document that was submitted by the plaintiff, it was

12   restraining a number of parties that aren't present in this

13   action.  My understanding would be that the scope of this

14   would only apply to, basically, the three defendants that

15   were named, the County Commission of Fayette County, as far

16   as sending out a cease and desist order or taking some

17   action against the defendants.  Is that --

18           THE COURT:  Do you wish to be heard on that

19   matter, Mr. Miller?

20           MR. MILLER:  I do, Your Honor.  I think it needs

21   to be broader than that.  The ordinance also included

22   enactment of private citizens through its powers delegated

23   to private citizens to enforce this action.  So I think the

24   TRO order itself would have to basically indicate that the

25   ordinance itself is, at this point, invalid and no lawful

1    effect until such time as otherwise determined by the Court,

2    so that we're not at risk of private citizen suits or other

3    action taken.

4              THE COURT:  Anything further on the point?

5              MR. RIST:  No, Your Honor.

6              THE COURT:  It seems to me that the most reach

7    of -- the greatest reach of the temporary restraining order

8    would be the defendants in this action and those acting in

9    concert with them, and so the breadth of the temporary

10   restraining order would be limited to that extent.

11        Is there anything further?

12             MR. RIST:  No, Your Honor.

13             MR. MILLER:  No, Your Honor.

14             THE COURT:  If not, then we'll stand continued as

15   indicated and we'll await your further submissions.

16        Thank you.

17             MR. MILLER:  Your Honor, I do have one query.

18        Did you want us to prepare a written order including

19   findings of the Court for submission?

20             THE COURT:  I'd be happy for you to do that.  Are

21   you able to do that today?

22             MR. MILLER:  We can do that, yes.

23             THE COURT:  And run a copy of that by the defense

24   counsel, and if you are able to reach agreement on what has

25   taken place today, that's fine.  If you can't, then you'll

1    simply have to furnish what you propose to the Court, in the

2    absence of agreement, and the Court will then take that into

3    account in framing the order.

4        So we'll hear from you later today, I take it?

5            MR. MILLER:  Yes, Your Honor.  Thank you.

6            THE COURT:  Thank you.

7            THE CLERK:  All rise.

8        (Proceedings concluded at 10:45 a.m.)

9                    CERTIFICATE OF OFFICIAL REPORTER

10       I, Catherine L. Schutte-Stant, Federal Official Court

11   Reporter, in and for the United States District Court, for

12   the Southern District of West Virginia, do hereby certify

13   that the foregoing is a true and correct transcript of the

14   stenographically reported proceedings held in the

15   above-entitled matter.

16                    Dated February 2, 2016.

17

18           /s/ CATHERINE L. SCHUTTE-STANT, RMR, CRR

19           _____
             CATHERINE L. SCHUTTE-STANT, RMR, CRR
20           FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25