UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


EQT PRODUCTION COMPANY,

      Plaintiff,

v.                                         Civil Action No. 16-00290

MATTHEW D. WENDER, in his official
capacity as President of the County
Commission of Fayette County, West Virginia,
DENISE A. SCALPH, in her official
capacity as a Commissioner of the County
Commission of Fayette County, West Virginia,
and JOHN H. LOPEZ, in his official
capacity as a Commissioner of the County
Commission of Fayette County, West Virginia,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


      This case, in which the plaintiff seeks a permanent injunction enjoining the enforcement of a county ordinance enacted by the defendants, coupled with a judgment declaring, <u>inter alia</u>, the ordinance preempted, is pending on cross-motions for summary judgment.


I.  <u>Factual and procedural background</u>


A.


      With respect to the plaintiff's assertion of preemption, the material facts are undisputed.  Plaintiff EQT Production Company ("EQT") operates approximately 200 producing

oil and natural gas extraction wells in Fayette County, West
Virginia.  See Revised Statement of Stipulated Facts ("Rev.
Stip."), ¶ 2.  EQT also operates one "underground injection
control" ("UIC") well in Fayette County.  Id. ¶ 3; see also
Original Stipulations ("O. Stip."), Ex. C, p. 2 (map showing
location of extraction wells and UIC well).[1]  EQT runs the wells
under permits issued by the West Virginia Department of
Environmental Protection ("DEP").  Rev. Stip. ¶ 3; see also O.
Stip., Ex. A, UIC Permit, pp. 1-8.  EQT's UIC well permit was
first issued in 1986 and most recently renewed in 2013.  Rev.
Stip. ¶ 3.

The extraction wells generate significant quantities
of non-fuel fluids as part of the extraction process.  Rev.
Stip. ¶ 5.  These byproducts are referred to by various terms in
the briefing, the scientific literature, and the applicable
regulations.  The court concludes that the fluid is aptly termed
"wastewater," and refers to it as such throughout this opinion.
The wastewater potentially contains various dissolved metals,

---

1   As noted later in this opinion, the parties filed two
stipulations of fact -- an original set and, some weeks later, a
revised one.  The original stipulations were accompanied by three
attached exhibits, labelled Exhibits "A" through "C."  In the
revised stipulations, the parties refer to the exhibits attached
to the original stipulations, but do not expressly incorporate
them by reference.  In the interests of clarity and convenience,
the court deems them so incorporated.

metalloids, salts, organic compounds, and other substances, some of which are believed to be injurious to human health.  See O. Stip., Ex. A, p. 6 (listing maximum allowable levels of various wastewater constituents); see also Response, Ex. 1.

Wastewater is separated from extracted fuel at the wellheads and placed in storage tanks located at the drilling sites.  Rev. Stip. ¶ 5.  EQT periodically transports the wastewater stored at its drilling sites both in and outside of Fayette County to its Fayette County UIC well for "disposal." Id. ¶ 5.  There, it is injected deep into the earth's crust, where it is separated by layers of impermeable rock from underground sources of drinking water.  See id.; see also 40 C.F.R. §§ 144.6(b), 144.28(f).  The parties have stipulated that the injected wastewater includes substances referred to in the "Definitions" section of the Fayette County ordinance whose enactment precipitated this case.  Rev. Stip. ¶¶ 4-5.

On January 12, 2016, defendants Matthew D. Wender, Denise A. Scalph, and John H. Lopez (collectively, "the Commission"), enacted the ordinance, entitled as "Ordinance Banning the Storage, Disposal, or Use of Oil and Natural Gas Waste in Fayette County, West Virginia."  See Complaint ("Compl."), Ex. 1, p. 6.  The Commission later enacted an amended version of the ordinance on March 25, 2016.  The parties

3

agree that the amended ordinance (hereinafter, simply "the Ordinance") superseded the original version.

The Ordinance purports, _inter alia_, to prohibit anywhere in Fayette County (1) the storage of wastewater in UIC wells, and (2) the temporary storage, handling, treatment, or processing of wastewater unless it is at a site operating under a permit for a conventional vertically-drilled well issued pursuant to West Virginia Code section 22-6-6.  See Ordinance § 1.1, 1.5.  Violation of the Ordinance is a misdemeanor, punishable by imprisonment in the "regional jail" for up to one year and/or the imposition of a $1,000 fine per violation per day.  Id. at §§ 3, 4.  The Ordinance also provides for civil enforcement by county citizens, encouraged by a fee shifting scheme, and by the county itself.  Id. at § 3.2, 3.3.

B.

EQT initiated this action with the filing of its complaint on January 13, 2016.  See Compl.; TRO Motion, p. 1. EQT challenges the following provisions of the Ordinance: (1) the regulations of storage of wastewater at conventional vertical drilling sites regulated under West Virginia Code section 22-6-6; (2) the apparent ban on any storage of wastewater produced by sites conducting horizontal drilling; (3)

4

the ban on storage of wastewater in UIC wells; (4) the extension of enforcement authority to Fayette County residents; and (5) a provision disallowing the use of a valid permit in defending against an enforcement action.

The eight count complaint alleges that the Ordinance is preempted by the West Virginia Oil and Gas Act, W. Va. Code §§ 22-6 through 22-10, et seq. (Compl. ¶¶ 37-46), and the West Virginia "underground injection of fluid" program, a state-run UIC well permitting program established pursuant to the federal Safe Drinking Water Act, 42 U.S.C. § 33f, et seq. (¶¶ 47-57).[2]

On January 13, 2016, EQT filed an emergency motion for a temporary restraining order.  The court held a hearing on the motion on January 19, see Hearing Transcript ("Tr."), Doc. No. 23, and entered a temporary restraining order the following day. On January 29, 2016, as directed by the court, the parties filed

---

2  EQT further asserts that the Ordinance constitutes an ultra vires exercise of power by the Commission (¶¶ 58-67), an unconstitutional "taking," in violation of each the Fifth Amendment to the United States Constitution and Article 3, section 9, of the West Virginia constitution (¶¶ 68-74 and 75-80, respectively); an unconstitutional impairment of contract, in violation of each Article I, section 10, of the United States Constitution and Article 3, section 4, of the West Virginia constitution (¶¶ 81-87 and 88-92, respectively); and an illegal zoning ordinance, in violation of West Virginia Code section 8A-7-1, et seq. (¶¶ 93-105).  In view of the disposition of this action on preemption grounds, the court does not address these claims.

a stipulation of facts, which was followed by an amended
stipulation on March 1.  In the meantime, the court entered an
agreed order granting EQT's motion for a preliminary injunction.
See February 11, 2016, Order.  On May 6, 2016, EQT filed its
motion for summary judgment and preliminary injunction,[3] followed
by the Commission's deemed cross-motion on May 20, 2016.

## II.  Governing standards

### A.

Summary judgment is appropriate only "if the movant
shows that there is no genuine dispute as to any material fact

---

3  As a preliminary matter, EQT titled its brief as "Plaintiff's
memorandum in support of motion for summary judgment and permanent
injunction," although it did not file a freestanding motion seeking
such relief.    Nonetheless, inasmuch as EQT's complaint seeks
declaratory and injunctive relief, and given that the court's
February 11 and March 28, 2016, preliminary injunction orders
provided for briefing of EQT's motion for permanent injunctive
relief prior to the final hearing on the merits of the request for
permanent injunctive relief, the court will treat EQT's initial
brief as including a motion for summary judgment and permanent
injunctive relief.    In the Commission's response brief, the
Commission requests that, "to the extent that the [c]ourt treats
[EQT's] filing as a memorandum in support of a motion for summary
judgment, it should similarly treat [the Commission's] instant
filing."    See Response, p. 1.    Finding it appropriate to do so,
the court grants the Commission's request.  EQT's objection to the
materials filed in support of the Commission's deemed motion, in
which EQT objects to the admissibility of the declaration of
Matthew Wender and the attachments thereto, is sustained inasmuch
as those materials relate to wells operated by Danny Webb.  To the
extent the materials help to clarify or explain the scientific
aspects of this case, EQT's objection is denied.

and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to
establish the elements of a party's cause of action.  <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>News</u>
<u>& Observer Publ'g Co. v. Raleigh-Durham Airport Auth.</u>, 597 F.3d
570, 576 (4th Cir. 2010) (same).

When examining the record, the court must neither
resolve disputes of material fact nor weigh the evidence,
<u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995);
<u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).
Inferences that are "drawn from the underlying facts," if any
"must be viewed in the light most favorable to the party
opposing" it.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655
(1962).  A party is entitled to summary judgment if the record
as a whole could not lead a rational trier of fact to find for
the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823
(4th Cir. 1991).

### B.

A permanent injunction is a form of equitable relief,
appropriately granted when the court has found for the plaintiff
on the merits of one or more of its claims and a legal remedy
would be insufficient.  <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469,

477-78 (1962).   To obtain a permanent injunction, EQT must demonstrate "that it has suffered an irreparable injury; [] that remedies at law, such as monetary damages, are inadequate to compensate for that injury; [] that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and [] that the public interest would not be disserved by a permanent injunction."   eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see also PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 126 (4th Cir. 2011) (reciting the eBay factors).

The relief granted must be no more expansive or burdensome than necessary to protect the plaintiff.   See Kentuckians for the Commonwealth, Inc. v. Rivenburgh, 317 F.3d 425, 436 (4th Cir. 2003) ("It is well established that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979))).   In other words, a permanent injunction must "carefully address only the circumstances in the case," without reaching farther than is required "to provide complete relief to the plaintiff."   Mead Johnson & Co., 639 F.3d at 128 (internal quotation marks and citation omitted).

8

III.   <u>EQT's standing to challenge the Ordinance</u>

The Commission, in its response brief, suggests that EQT lacks standing to challenge the Ordinance.  Specifically, the Commission asserts that EQT cannot demonstrated that it has suffered an injury caused by the challenged provisions, namely the ban on disposal of wastewater in UIC wells, the regulation of on-site storage at conventional vertical drilling sites, and the apparent ban on storage of wastewater produced by sites conducting horizontal drilling.  Inasmuch as standing is a jurisdictional requirement the court addresses it at the outset.

The burden of demonstrating standing is on the party who seeks the exercise of jurisdiction in his favor."  <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936).  The Fourth Circuit has held that "a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions."  <u>Covenant Media of S.C., LLC v. City of N. Charleston</u>, 493 F.3d 421, 430 (4th Cir. 2007) (<u>citing</u> <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 230 (1990)).  As suggested above, only the element of injury is in question.

"[T]he irreducible constitutional minimum of standing contains three elements."  <u>Lujan v. Defenders of Wildlife</u>, 504

U.S. 555, 560 (1992).  That is, "the plaintiff must have suffered an injury in fact," bearing a "causal connection to the conduct complained of," which is "likely" to be redressed by a decision in his favor.  Id. at 560-61 (internal citations and quotation marks omitted).  At bottom, standing "depends . . . on whether the plaintiff is the proper party to bring the suit." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 460 (4th Cir. 2005) (internal quotation marks, citation, and alteration omitted).

To establish the first element of standing, "a plaintiff 'must show that he personally has suffered some actual or threatened injury.'"  Heckler v. Matthews, 465 U.S. 728, 736 (1984).  An adequate injury, for standing purposes, consists in "an invasion" of a legally protected interest" that is shown to be both "concrete and particularized . . . and [] actual and imminent."  Defenders of Wildlife, 504 U.S. at 560.  These requirements "'ensure that the alleged injury is not too speculative,'" remote, abstract, or imaginary.  Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 322 (4th Cir. 2002) (citing Defenders of Wildlife, 504 U.S. at 564-65 n. 2)).

Future injury may confer standing.  Defenders of Wildlife, 504 U.S. at 560.  Although a plaintiff need not prove that he is guaranteed to suffer future injury, he must at least

10

be able to show "a sufficient likelihood" of encountering later harm.  City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983); see Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 216-27 (1974) (plaintiff's injury -- whether past or future -- must be "concrete" and not "abstract"); Defenders of Wildlife, 504 U.S. at 560 (injury must not be "conjectural or hypothetical"); see also Wright & Miller, 13A Federal Practice and Procedure § 3531.4 (3d ed.) ("The anticipation of future injury may itself inflict present injury.").  But, because potential future injury is inherently more uncertain than accomplished past injury, courts must closely scrutinize such claims to "filter the truly afflicted from the abstractly distressed."  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (en banc).

A.  The Ordinance's ban on disposal of wastewater in UIC wells

The Commission asserts that EQT cannot establish that it faces a realistic threat of enforcement of the Ordinance's ban on the permanent storage of wastewater in UIC wells, and thus lacks standing.  See Response, p. 4.

The impending burden of compliance with a new law generally can constitute an actual injury for standing purposes. See Lozano v. City of Hazleton, 620 F.3d 170, 188-92, 193-94 (3d

11

Cir. 2010) (landlord plaintiffs had standing to challenge
ordinance requiring proof of legal citizenship from prospective
renters; landlords were injured by increase in compliance
costs).  One seeking to challenge the validity of a criminal
statute in particular must "show a threat of prosecution under
the statute."  Doe v. Duling, 782 F.2d 1202, 1206 (4th Cir.
1986) (citing, inter alia, Babbitt v. United Farm Workers Nat.
Union, 442 U.S. 289, 298-99 (1979) and Ellis v. Dyson, 421 U.S.
426, 433 (1975)).  But "persons having no fears of state
prosecution except those that are imaginary or speculative"
cannot make the requisite showing.  Younger v. Harris, 401 U.S.
37, 42 (1974).  Rather, the supposed threat of prosecution must
be "credible," Babbitt, 442 U.S. at 298, and "alive at each
stage of the litigation," Ellis, 421 U.S. at 435.  At minimum, a
plaintiff must be able to show a threat of prosecution that is
both real and immediate.  Golden v. Zwickler, 394 U.S. 103, 109-
10 (1969); see also Duling, 782 F.2d at 1206 ("[A] litigant must
show more than the fact that state officials stand ready to
perform their general duty to enforce laws.").

    The Commission points to Doe v. Duling, 782 F.2d 1202,
in support of its position.  See Response, p. 4.  Duling,
however, is the exception, not the rule, and its specific
holding lends little support to the Commission's position.  The

court in Duling examined the plaintiffs' standing to challenge a
state statute described by the court as "antique" and "largely
symbolic."  782 F.2d at 1207.  The statute had last been applied
in the 19th century, and although it appeared that the
plaintiffs were in technical violation of its proscriptions, the
court concluded that they were in no real danger of prosecutions
and hence lacked standing.  Id. at 1208-09.

        The situation here is quite different.  First, the
Ordinance is of very recent vintage, having been enacted on
January 12, 2016, followed the next day by the filing of this
action, prompting the amendment of the Ordinance on March 25,
2016, while the agreed preliminary injunction remained in place.
It is obviously meant to be used -- otherwise, why pass it and
refine it in the first place?  Further, the Commission has not
disavowed any intention of enforcing the Ordinance against EQT,
though even if it had, the Ordinance provides for civil
enforcement by Fayette County citizens, who would presumably be
free to proceed unilaterally.  The Ordinance is thus
distinguishable from the moth-eaten "antique" in Duling.

        The parties' amended stipulation of facts shows that
EQT operates one UIC well within Fayette County.  See Rev. Stip.
¶ 3.  As noted, that well is used for the permanent disposal of
wastewater generated by EQT's producing oil and gas wells.  The

13

Ordinance, on the other hand, expressly bans permanent disposal of wastewater, and promises serious consequences for infractions.  A plaintiff challenging a constitutionally-dubious statute should generally be afforded recourse to the courts as soon as sanctions have been threatened, at least so long as the supposed threat is more than the speculative worrying of an anxious mind.  See Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30-33 (1st Cir. 1999) (threat of prosecution was sufficiently real and imminent in light of clear statutory prohibition); Peyote Way Church of God, Inc. v. Smith, 742 F.2d 193, 198-99 (5th Cir. 1984) (church had standing to challenge statute banning religious use of peyote; there was realistic and clear danger of imminent prosecution in light of state's firm position that statute applied and was valid); see also Wright & Miller, 13A Federal Practice and Procedure § 3531.4 n. 163 ("A private party need not expose itself to actual arrest and prosecution by violating [a] statute in order to achieve standing.").  EQT's concerns about prosecution are not speculative.  Although EQT has not shown the existence of a literal threat to prosecute from county enforcers, under these circumstances, the Ordinance itself is the threat. Consequently, the court concludes that EQT has standing to

14

challenge the provision banning disposal of wastewater in UIC wells.[4]

### B.   The Ordinance's effective ban on any storage of wastewater produced at horizontally-drilled wells

According to EQT, the Ordinance effectively outlaws horizontal drilling anywhere in Fayette County.  EQT claims that the Ordinance accomplishes this result by first establishing a general, county-wide ban on all storage of wastewater, then carves out an exception applicable to the temporary storage of wastewater at drilling sites permitted under West Virginia Code section 22-6-6.  Sites where oil and gas exploration is proceeding under permits issued by the DEP pursuant to section 22-6-6 are by definition conducting conventional drilling -- that is, drilling vertically into oil- or gas-bearing rock formations, rather than horizontally.  See W. Va. Code § 22-6-6.  Because horizontally-drilled wells are regulated permitted under section 22-6A-7, to which the Ordinance does not apply, EQT

---

[4] The Commission maintains that EQT cannot establish actual injury from the Ordinance's citizen enforcement provision or the provision precluding reliance on a state or federal permit as a defense to prosecution under the Ordinance.  On the contrary, because EQT has standing to challenge the portions of the statute that prohibit permanent injection of waste and, as discussed below, that regulate storage activity at conventional vertical drilling sites, it also has standing to challenge the Ordinance's related enforcement provisions.

interprets the Ordinance to prohibit even temporary storage at horizontally-drilled wells, effectively prohibiting their operation altogether.  It appears that EQT's interpretation of the Ordinance on this point is accurate.

The Commission argues that because EQT does not engage in horizontal drilling at any of its Fayette County extraction wells, the Ordinance's apparent ban on horizontal drilling -- which interpretation of the Ordinance the Commission does not concede -- poses no possibility injury to EQT.  See Resp., pp. 3-4.

The parties' amended stipulation of facts establishes that EQT's extraction wells are "authorized by a permit issued by the []DEP pursuant to W. Va. Code §§ 22-6-1 et seq." Rev. Stip. ¶ 2; see also Tr. at 7:10-13 (Counsel for EQT: "These are conventional wells, vertical wells.").  As noted above, Chapter 22, Article 6, and in particular section 22-6-6, applies to vertically-drilled extraction wells.  Horizontal drilling, on the other hand, is regulated by the Natural Gas Horizontal Well Control Act in Article 6A.  See W. Va. Code § 22-6A-1 et seq.

Where a statute does not impact the plaintiff in any identifiable way, the plaintiff cannot show an injury in fact, and hence lacks standing.  See, e.g., Wilcher v. City of Akron,

16

498 F.3d 516, 522 (6th Cir. 2007) (statute prohibited non-residents from submitting tapes to local news channel; resident plaintiff not prohibited from submitting a tape, and therefore she suffered no injury); <u>Texas Indep. Prod. and Royalty Owners Assoc. v. E.P.A.</u>, 435 F.3d 758, 765-66 (7th Cir. 2006) (association of oil and gas producers lacked standing because statute made expressly clear that it did not apply to them); <u>Breaux v. U.S. Postal Service</u>, 202 F.3d 820, 821 (5th Cir. 2000) (plaintiff never suffered late delivery of express mail; he therefore lacked standing to complain of late delivery or failure to give adequate notice of late delivery).  Inasmuch as EQT has not presented any evidence that the Ordinance's prohibition of temporary storage of horizontal-drilling wastewater would affect its operations in Fayette County in any way, the court concludes that EQT has not demonstrated an actual injury caused by that provision of the statute, and hence lacks standing to challenge it.  That EQT might seek in the future to conduct horizontal drilling is not sufficient to demonstrate actual injury, as this possibility is both highly speculative and -- in view of the dense permitting system to be navigated -- too remote.

### C.   The Ordinance's regulation of storage at conventional, vertically-drilled wells

The Commission asserts that EQT faces no actual injury from the Ordinance's regulation of wastewater storage at conventional drilling sites operating under section 22-6-6 permits.  The Ordinance provides, in relevant part, as follows:

> The deposition, storage, treatment, injection, processing, or permanent disposal of natural gas waste and oil waste onto or into the land, air, or waters within Fayette County shall be prohibited. This prohibition shall specifically apply to injection wells for the purpose of permanently disposing of natural gas waste and oil waste. Provided, however, that the temporary disposition, temporary storage, treating, or processing of natural gas waste and oil waste at a facility or site where natural gas extraction activities and/or oil extraction activities are occurring and are regulated by a permit issued pursuant to W. Va. Code § 22-6-6 shall not be prohibited.

Ordinance, pp. 3-4.  The Ordinance defines "temporary storage" as the "local containment of natural gas waste or oil waste which will not be permanently stored or permanently disposed of at any site in Fayette County." Id. at p. 3.  In support of its position, the Commission points to evidence in the record indicating that EQT does not permanently store wastewater at its Fayette County drilling sites, instead storing it temporarily on-site before eventually taking it to the UIC well for permanent disposal.  See Response, pp. 2-3 (citing Rev. Stip. ¶¶ 2, 5).

18

It is not clear on the face of the Ordinance when
"temporary" storage ends and "permanent" storage begins, as
"temporary storage" is defined tautologically as storage that is
not permanent.  <u>See</u> Ordinance, p. 3.  The record indicates,
however, that EQT stores wastewater at its drilling sites for
some amount of time before it is taken to the UIC well for
injection.  <u>See</u> Rev. Stip. ¶¶ 2, 3, 5; <u>see</u> <u>also</u> Reply, p. 7
(claiming this time to be potentially "many years").

Because the court, for standing purposes, must look
not to the merits, but simply to whether EQT is the proper party
to challenge this provision, <u>Jenkins v. McKeithen</u>, 395 U.S. 411,
423 (1969), the Commission's assurance that the Ordinance does
not affect EQT's operations, <u>see</u> Response, p. 3, does not alter
the uncertainty of EQT's position.  Such storage is legal under
state law, <u>see, e.g.</u>, W. Va. Code § 22-6-19, but is potentially
forbidden by the Ordinance.  As discussed more fully below, EQT
claims that state law occupies the field of oil and gas
exploration as against local law.  If that were so, the
Ordinance would be void and EQT's uncertainty would be
ameliorated.  Under the circumstances, this is enough to confer
standing.  Wright & Miller, 13A <u>Federal Practice and Procedure</u> §
3531.4 ("Living with fear and uncertainty is itself a burden,

and prudence may dictate efforts to avoid or reduce possible injury.").

## IV.   Discussion of the merits

EQT's primary contention on the merits is that the Ordinance is preempted by state law.  According to EQT, those portions of the Ordinance regulating the storage of wastewater at conventional vertical extraction sites are preempted by the West Virginia Oil and Gas Act, whereas those portions prohibiting permanent storage of wastewater in UIC wells are preempted by West Virginia's UIC program, promulgated by the DEP under the auspices of the federal Safe Drinking Water Act.  See Plaintiff's Memorandum ("Pl. Mem."), pp. 9-14, 14-20.  The Commission, in response, maintains that the Ordinance does not conflict with the West Virginia Oil and Gas Act and, further, that both state and federal law on the subject allow room for local regulation.  The Ordinance, again, provides as follows:

> The permanent disposal of natural gas [or] oil waste
> . . . within Fayette County shall be prohibited. . . .
> This prohibition shall specifically apply to injection
> wells for the purpose of permanently disposing of
> natural gas waste and oil waste. . . .  [T]he temporary
> . . . storage . . . or processing of natural gas waste
> or oil waste at a facility . . . where . . . extraction
> activities are occurring and are regulated by a [section
> 22-6-6] permit shall not be prohibited.

See Ordinance, pp. 3-4.

20

## A.  The powers of county commissions, generally

County commissions, like municipalities, are artificial entities created by state statute.  Butler v. Tucker, 187 W. Va. 145, 150 (1992).  As such, they possess only the powers expressly granted to them by the state constitution or legislature, or necessarily implied from those expressly given.  Id.  Article IX, section 11, of the West Virginia constitution provides, in relevant part, as follows:

> The county commissions, through their clerks, shall have the custody of all deeds. . . .  They shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads . . . with authority to lay and disburse the county levies: Provided, That no license for the sale of intoxicating liquors in any incorporated [municipality] shall be granted without the consent of the municipal authorities thereof. . . .  Until otherwise prescribed by law, they shall, in all cases of contest, be the judge of the election, qualification and returns of their own members . . . subject to such regulations . . . as may be prescribed by law.  Such commissions may exercise such other powers, and perform such other duties, not of a judicial nature, as may be prescribed by law. . . .

W. Va. Const., Art. IX, § 11.  The final sentence of section 11 has long been held to vest in the state legislature alone the authority to expand the powers of county commissions beyond those laid out in the constitution.  See, e.g., State ex rel. Cty. Ct. of Cabell Cty. v. Arthur, 150 W. Va. 293, 296-96 (1965)

("[I]n determining the powers of the count[ies] . . . we must look to the constitution, which created th[ose] bod[ies], and to the laws which were enacted by the legislature pursuant to the constitutional provisions."); Syllabus, Barbor v. Cty. Ct. of Mercer Cty., 85 W. Va. 359 (1920) (same).

The legislature has not been miserly in doing so. Exemplary selections of delegated powers, as set forth in Chapter 7 of the state code, include the authority to construct and maintain county transportation facilities, § 7-1-3o, to "regulate the removal    . . . of refuse and debris," § 7-1-3ff(b), and to regulate the locations of businesses offering nude dancing, § 7-1-3jj, among many others.  See W. Va. Code §§ 7-1-3 through 7-1-3nn, 7-14 through 7-1-15; see also, e.g., Syl. Pt. 1, State ex rel. State Line Sparkler of WV, Ltd. v. Teach, 187 W. Va. 271 (1992) ("By authorizing county commissions to exercise the police power with regard to the safety and quality of building construction . . . the legislature has, by implication, granted counties the power to enforce violations of [the] building code . . . by imposing a fine.").  But at bottom, county commissions "can only do such things as are authorized by law," and then only "in the mode prescribed."  T. Weston, Inc. v. Mineral Cty., 636 S.E.2d 167, 172 (W. Va. 2006) (quoting Butler, 187 W. Va. at 150).  Local power is, by its nature,

neither inherent nor absolute.  Bissett v. Town of Littleton, 87
W. Va. 127, --, 104 S.E. 289, 290-91 (1920) (holding that local
government had no inherent power to regulate the hours of a
billiards parlor operating under state license in absence of
statutory grant of authority from state).

Here, the Commission maintains that the Ordinance
constitutes an exercise of its "sovereign" power, see Response,
pp. 1, 31, and claims the authority to make "legislative
judgments" to which the court must give "complete deference,"
id. at pp. 23, 32.  In the Ordinance, moreover, the Commission
included the finding that it possesses "plenary power to
eliminate hazards to public health" and abate nuisances.  See
Ordinance, p. 1.  Contrary to the Commission's findings, its
powers -- far from plenary -- are either expressly granted,
necessarily implied, or else non-existent.  See Syl. Pt. 1,
Brackman's Inc. v. City of Huntington, 126 W. Va. 21 (1943).

Perhaps in anticipation of this conclusion, the
Commission claims in the alternative that West Virginia Code
section 7-1-3kk acts as a specific grant of power from the state
legislature to regulate drilling wastewater.  Section 7-1-3kk
empowers county commissions to:

> [E]nact ordinances, issue orders and take other
> appropriate and necessary actions for the elimination of

> hazards to public health and safety and to abate or cause
> to be abated anything which the commission determines to
> be a public nuisance.  The ordinances may provide for a
> misdemeanor penalty for its violation.  The ordinances
> may further be applicable to the county in its entirety
> or to any portion of the county as considered appropriate
> by the county commission.

W. Va. Code § 7-1-3kk.

## B.  Preemption by state law, generally

Because local governments are creatures of the state, and therefore possessed only of delegated power, local ordinances are "inferior in status and subordinate to [state] legislative acts." Am. Tower Corp. v. Common Council of City of Beckley, 210 W. Va. 345, 350 (2001).  The inferior status of local enactments may be expressly pronounced, Found. for Indep. Living, Inc. v. Cabell-Huntington Bd. of Health, 214 W. Va. 818, 831 (2003) ("Without question, the regulatory authority of local boards of health is limited by statute to be 'consistent with state public health laws. . . .'"); W. Va. Code § 16-9A-5, but it is always at least implied, Brackman's Inc., 126 W. Va. 21, --, 27 S.E.2d 71, 78.

It is certainly the case under West Virginia law that, "where [a local] ordinance is in conflict with a state law, the former is invalid." Id. (citing Vector Co. v. Bd. of Zoning Appeals, 155 W. Va. 362, 367 (1971)).  This is analogous to the

24

"impossibility" variant of conflict preemption under federal law.  See California v. ARC Am. Corp., 490 U.S. 93, 100-01 (1989) ("[S]tate law is . . . pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible. . . .") (internal quotation marks and citations omitted); see also 15-103 Moore's Federal Practice -- Civil § 103.45[2] (In the case of "'conflict' preemption, the state cause of action is superseded because it directly clashes with -- and therefore undermines -- federal law.").

"Direct" conflict between local and state law, in the sense of it being impossible to comply with both, is not required for local law to be preempted, however.  In Brackman's, the plaintiff sought an order requiring the defendant municipality to issue it a license to serve non-alcoholic beer. 27 S.E.2d at 72-73.  The plaintiff was already in possession of such a license issued by the state government, but the municipality denied it issuance of a city license on the basis of a provision in the municipality's charter.  Id.  Observing that "towns and cities are without power to adopt ordinances which might, in any way, interfere with legislative enactment," the court stated that, inasmuch as local power is derived from an express grant by the state government, "the power vested in

25

municipalities [cannot] extend to the refusal of a license where proper application is made therefor[] and the applicant [holds] a state license to carry on the business . . . for which he seeks a municipal license[.]" <u>Id.</u> at 76.  In short, the court felt that "it [was] difficult to believe that it was ever intended that any citizens should be induced by the state to pay a license fee for particular privileges and, through another, relatively inferior agency of the state be deprived of the use of such privilege." <u>Id.</u> at 78.  Where an activity is sanctioned by the state, a local governmental entity cannot legislate independently to prohibit or impede that activity.  <u>See</u> <u>Brackman's Inc.</u>, 27 S.E.2d at 78.  Thus, it can be said that even if a local ordinance is merely "inconsistent . . . with a statute enacted by the [state legislature,] the statute prevails and the . . . ordinance is of no force and effect."  Syl. Pt. 1, <u>Vector Co.</u>, 155 W. Va. 362; <u>see also</u> Syl. Pt. 3, <u>State ex rel.</u> <u>Foster v. City of Morgantown</u>, 189 W. Va. 433 (1993) (same); Syl. Pt. 2, <u>State ex rel. Plymale v. City of Huntington</u>, 147 W. Va. 728 (1963) (same).

     In other words, "towns and cities," as well as counties, "are without power to adopt ordinances which might, in any way, interfere with legislate enactment . . . passed in carrying out a particular policy of the [state l]egislature."

26

_Brackman's Inc._, 27 S.E.2d at 78.  This is analogous to the
"obstacle" variant of conflict preemption in federal law.  _See_
_Jones v. Rath Packing Co._, 430 U.S. 519, ---, 97 S. Ct. 1305,
1318 (1977); _see also_ _ARC Am. Corp._, 490 U.S. at 100-01
("[S]tate law is . . . pre-empted to the extent it . . . stands
as an obstacle to the accomplishment and execution of the full
purposes and objectives of Congress.") (internal quotation marks
and citations omitted).  "Such subordination" of local power "'to
the predominant power of the state is necessary to avoid serious
confusion and ofttimes absurd results.'"  _Found. for Indep._
_Living_, 214 W. Va. at 831 (_quoting_ _Brackmans Inc._, 27 S.E.2d at
78) (internal alterations omitted).  Thus, "the fact that the
state has entered into the field of regulating [particular
conduct] by license" does not preclude local governments from
also licensing such conduct so long as the local ordinance
"conform[s] with, and is not in conflict with[,] state law."
_Alderson v. City of Huntington_, 132 W. Va. 421, 429-30 (1949);
_see also_ _City of Morgantown v. Nuzum Trucking Co._, --- S.E.2d
---, 2016 WL 1397287, No. 15-0127 (W. Va. 2016) (same).

        The Commission asserts that "the doctrine of field
preemption does not exist as a matter of West Virginia law with
regard to the relationship between local and state law."
Response, p. 7.  To support this assertion, the Commission

observes -- it seems accurately -- that no case decided by the
West Virginia Supreme Court of Appeals has turned expressly on
the application of field, as opposed to conflict, preemption.
See id. at pp. 7-8.  The court is indeed unable to locate a case
expressly applying the doctrine in this context.  It does find,
as the Commission concedes, that the Supreme Court of Appeals
has applied the doctrine when examining the relationship between
state law and federal law.  See Response, p. 7 n. 2.
Nonetheless, the court is satisfied that West Virginia's highest
court would conclude that field preemption applies as between
state and local governments substantially in the same way it
does between the states and the federal government.  For just as
federal law will displace state law when the two meet, so, too,
is state law superior to local law.  See Syl. Pt. 1, Vector Co.,
155 W. Va. 362.  Put another way, "[a]ttached to every statute,
every charter, [and] every ordinance . . . affecting, or adopted
by, a municipality, is the implied condition that the same must
yield to the predominant power of the State[] when that power
has been exercised."  Brackman's Inc., 27 S.E.2d at 78; see also
City of Huntington v. State Water Commission, 137 W. Va. 786,
800 (1953).

1.  <u>**Preemption by the West Virginia Oil and Gas Act**</u>

West Virginia Code section 22-1-1(a)(2) provides that "[t]he state has the primary responsibility for protecting the environment," whereas "other governmental entities, public and private organizations, and [state] citizens have the primary responsibility of supporting the state in its role as protector of the environment." <u>Id.</u>  The state, in fulfilling its responsibility, acts primarily through its environmental protection agency, the DEP.  <u>See</u> W. Va. Code 22-1-1.  One important purpose of the DEP is to "consolidate environmental regulatory programs in a single state agency, while also providing a comprehensive program for the conservation, protection, exploration, development, enjoyment, and use of the natural resources of the state of West Virginia."  W. Va. Code § 22-1-1(b).

The West Virginia Oil and Gas Act constitutes the state's expression of its goals and concerns respecting the exploitation of West Virginia's oil and natural gas resources.  Section 22-6-2(c)(12) places upon the DEP the responsibility to "[p]erform all duties as the permit issuing authority for the state in all matters pertaining to the exploration, development, production, storage, and recovery of th[e] state's oil and gas[.]"  To that end, the DEP is empowered to "[a]dopt rules

with respect to the issuance [and] denial . . . of permits [for such activities], which rules shall . . . [be] adequate to satisfy the purposes of . . . article[s] [six,] six-a [horizontal drilling], seven [compensation for damage caused by oil and gas exploitation], eight [transportation of oils], nine [underground gas storage], ten [abandoned wells], and twenty-one [coalbed methane wells]." The rules promulgated under section 22-6-2 are to deal "particularly with . . . the consolidation of various state and federal programs which place permitting requirements on the exploration, development, production, storage, and recovery of . . . oil and gas."[5] <u>Id.</u>

Section 22-6-6, for its part, consists of a detailed set of requirements for receiving a DEP permit to engage in conventional, vertically-drilled oil and gas extraction. Other sections of Chapter 22 reflect the state legislature's intent to create a centralized system for ensuring both environmental protection and productive use of natural resources, organized around the DEP. Thus, West Virginia Code section 22-6-7 provides, in relevant part, as follows:

> (a) In addition to a permit for well work [under sections 22-6-6 or 22-6-6a], <u>the director</u> [of the DEP] . . . may either issue a separate permit, general permit, or a permit consolidated with the well work permit for the

---

5   These rules appear in Chapter 35 of the Code of State Regulations.

> discharge or disposition of any pollutant into waters of
> [West Virginia].

W. Va. Code § 22-6-7(a) (emphasis supplied).  Section 22-6-21
provides that a drilling permit "shall not be issued . . . if
the director determines that: (1) [t]he proposed well work will
constitute a hazard to persons; or . . . (4) [t]he proposed well
works fail to protect fresh water sources or supplies."
(emphases supplied).

All authority to oversee gas and oil exploitation in
West Virginia resides with the DEP.  See W. Va. Code § 22-6-
2(c)(12).  At no point is any power to regulate such matters
expressly granted to county commissions.  Finally, the operator
of any oil or gas well must register with the DEP's Division of
Water and Waste management any storage tank with a capacity of
1,320 gallons or more that is to be used for the storage of
wastewater.  See W. Va. Code §§ 22-30-3(1), 22-30-4.  If such a
tank is located within certain specified distances of public
drinking water sources, the tank is considered a "related tank"
under state law.  The owner of such a tank must file various
certifications with respect to tank design and construction,
spill prevention plans, and so on.  See W. Va. Code §§ 22-30-
3(15), 22-30-5, 22-30-6, 22-30-9.

Moreover, the Oil and Gas Act itself contains no savings clause granting counties the power to regulate oil and gas matters, including the storage of wastewater.  The sole source of power to which the Commission can point is West Virginia Code section 7-1-3kk.  Although section 7-1-3kk grants counties the power to abate nuisances within their borders, the Commission cannot use that general grant of power to interfere with an area of the law that the state has expressly reserved wholly to its own authority.  After all, "where both the state and a [local government] enact legislation on the same subject matter, it is generally held that if there are inconsistencies, the [local] ordinance must yield."  Davidson v. Shoney's Big Boy Rest., 181 W. Va. 65, 68 (1989); see also Chesapeake & Potomac Tel. Co. of W. Va. v. City of Morgantown, 144 W. Va. 149, 161 (1959) ("When a municipal ordinance is opposed to the policy of the state in relation to the subject-matter thereof and in conflict with the statute of the state in relation thereto, the ordinance is void to the extent of its conflict with the statute and should not be enforced.").  Here, the state has comprehensively regulated this area, including storage activity at drilling sites, and left no room for local control.  Consequently, the provisions of the Ordinance that purport to regulate the on-site storage of wastewater at section 22-6-6 sites are preempted by state law.

2.  <u>Preemption by the West Virginia UIC program</u>

According to EQT, the West Virginia UIC program, administered by the DEP pursuant to the federal Safe Drinking Water Act ("SDWA"), permits the use of UIC wells for permanent underground disposal of wastewater, and thus is in conflict with the Ordinance's prohibition on UIC disposal wells.  According to the Commission, however, the SDWA, as well as the West Virginia Water Pollution Control Act, each contain a savings clause that operates to permit the Commission to exercise it power under section 7-1-3kk, to abate nuisances, even in the face of state and federal law regulating UIC wells.

Among other things, the SDWA establishes a national program ("the UIC program") for regulating injection wells in order to protect underground sources of drinking water.  <u>See</u> 42 U.S.C. §§ 300g, 300h.  "Class II" wells, which are used exclusively to inject fluids associated with natural gas and oil extraction, are the type at issue here.  <u>See</u> 40 C.F.R. § 146.1 <u>et</u> <u>seq.</u>; <u>see</u> <u>also</u> W. Va. C.S.R. § 47-13-4.2.  In order to protect underground sources of drinking water, the SDWA authorizes EPA to issue regulations establishing standards for UIC programs, and allows each state to seek approval to administer its own UIC program based on those federal requirements.  <u>See</u> 42 U.S.C. §§ 300h(a), 300h-1(b).  Under

33

section 1422, 42 U.S.C. § 300h-1, states must meet EPA's minimum requirements for regulating Class II wells.  See 42 U.S.C. § 300h-1(b)(2).  In turn, section 1421, 42 U.S.C. § 300h, identifies the minimum requirements proposed state UIC regulatory programs must meet in order for a state to be granted primary enforcement authority (referred to as "primacy") over Class II well regulation.  Id.; see also 40 C.F.R. Part 144 (setting forth EPA regulations on contents of approvable state UIC programs).

State programs authorized under section 1422 must include requirements for well owners and operators governing construction, operation, monitoring, testing, reporting, and closure of Class II wells.  See 42 U.S.C. § 300h(b)(1)(C).  If a state does not assume primacy over its UIC program, the EPA must run the program in that state itself.  See 42 U.S.C. § 300h-1(c).  The West Virginia legislature sought primacy over its UIC program, and vested the DEP with authority to create and administer the program.  See W. Va. Code § 22-11-4(a)(13).  West Virginia's UIC program was approved by the EPA on December 9, 1983, effective January 9, 1984.  See Fed. Reg. 55127 (Dec. 9, 1983).  DEP has subsequently promulgated regulations implementing the state UIC program.  See W. Va. C.S.R. § 47-13-1 et seq.

The foregoing demonstrates that the SDWA requires the state to have a UIC permitting program that allows underground injection of wastewater, whether the program is run by the EPA itself or the state. See 42 U.S.C. §§ 300h(a), 300h-1(c)(1); see also Bath Petroleum Storage, Inc. v. Sovas, 309 F. Supp. 2d 357, 366, 367-368 (N.D.N.Y. 2004) (holding that the SDWA savings clause "reinforce[s] that Congress intended that states retain authority respecting underground injection so long as it does not impinge on the UIC program administered by the EPA").

EQT cites Mattoon v. City of Pittsfield, 980 F.2d 1 (1st Cir. 1992) for the proposition that the SDWA occupies the field of drinking water protection, and further that the savings clause only allows local regulation consistent with the UIC program. See Pl. Mem., pp. 16, 19-20. The Commission, in its response, counters that Mattoon applies only to the preemptive effect of the SDWA on federal common law claims, not its effect on local enactments. See Response, pp. 13-14.

In Mattoon, the plaintiffs, who allegedly contracted giardiasis from drinking contaminated water, brought suit against the defendant city, among other parties, for claimed violations of federal and state law. 980 F.2d at pp. 2-3. Count I of the complaint was labelled a "citizens' action" under the SDWA, and Count II alleged a "public nuisance" claim under

federal common law.  Id. at p. 3.  With respect to the latter, the court held that the SDWA preempted federal common-law nuisance claims, reasoning that, in light of the "comprehensive" nature of the SDWA regulatory program, "the regulatory scheme established under the SDWA evinces a clear congressional intention to entrust the regulation of public drinking water systems to an expert regulatory agency rather than the courts." Id. at pp. 4-5.  With regard to the SDWA savings clause, the court observed, in a footnote, that similar savings provisions in federal environmental protection statutes have been held by the Supreme Court to "not preserve a federal common law remedy in light of the comprehensiveness of the FWPCA as a whole."  Id. at p. 5. n. 4.  Thus, the court "ha[d] little hesitation in concluding that Congress occupied the field of public drinking water regulation with its enactment of the SDWA."  Id. at 4.

Although the defendants assert, as noted, that Mattoon concerned only the relationship between federal statutory and common law, the court concludes that the principles underlying the Mattoon decision apply equally to the relationship between the SDWA and state or local enactments.  The court in Mattoon observed that, "[w]ith minor exceptions, the SDWA applies 'to each public water system in each State[,]' 42 U.S.C. § 300g," and that, among other powers, "[t]he SDWA enables the

36

Administrator of the [EPA] . . . to 'publish maximum contaminant level goals and promulgate national primary drinking water regulations.'"   Id. at p. 4.   Those powers, centralized in the EPA, allow the SDWA to preempt not just federal common law, but contrary state and local law as well.

Nevertheless, as noted, the Commission suggests that the SDWA savings clause operates to give the Commission the authority to regulate UIC wells through its power, under West Virginia Code section 7-1-3kk to abate nuisances.   The savings clause provides as follows:

> Nothing in this subchapter [that is, 42 U.S.C. § 300f et seq.] shall diminish any authority of a State or political subdivision to adopt or enforce any law or regulation respecting underground injection but no such law or regulation shall relieve any person of any requirement otherwise applicable under this subchapter.

Id.   The Commission maintains that this provision exempts state or local laws that prohibit underground injection from the SDWA's UIC program, which itself by definition permits UIC injection.   See Response, p. 14.   EQT, however, contends that the savings clause's reference to local laws "respecting" UIC wells cannot reasonably be read as an invitation to prohibit wastewater injection.   See Reply, pp. 17-18.

To begin, the SDWA specifically provides that a state's UIC permitting program, whether run by the state or the EPA, may not prohibit "the underground injection of wastewater or other fluids which are brought to the surface in connection with oil or natural gas production. . . ." 42 U.S.C. §§ 300h(b)(2), 300h-1(c)(1). The Ordinance, by prohibiting permanent disposal of wastewater in UIC wells, directly violates this statutory requirement. Although the SDWA savings clause permits local law to remain effective despite the existence of a UIC program, surely the prohibition above prevents such local law from altogether preventing UIC activity. Further, although the SDWA savings clause refers to both "[s]tate[s]" and their "political subdivision[s]," the superior, overriding power of the state must enable the state to occupy the field to the exclusion of its own subdivisions, lest its superiority be circumscribed. Here, the state has undertaken to allow UIC wells, an action that operates to diminish the counties' powers to prohibit them.

The Commission also argues that a savings provision within the West Virginia Water Pollution Control Act, W. Va. Code § 22-11-1, et seq. ("the WPCA") applies to save the

Ordinance from preemption.[6]  See Response, p. 12.  That provision
indicates that the state, local governments, and private parties
may exercise whatever rights they have to bring an "action" to
"suppress" or "abate" nuisances and pollution.  W. Va. Code §
22-11-27.

     The Commission cites Sharon Steel Corp. v. City of
Fairmont, 175 W. Va. 479 (1985), in support of its position that
the savings clause in the SDWA and the West Virginia Water
Pollution Control Act provide the county with authority to
exercise its power under West Virginia Code section 7-1-3kk to
enjoin nuisances.  In Sharon Steel, the City of Fairmont adopted
an ordinance that prohibited "the permanent disposal of
hazardous waste as a public nuisance."  175 W. Va. at 482.  A
company that intended to construct a hazardous waste disposal
facility challenged the ordinance on the grounds that it was
preempted by federal and state law and that the city lacked the
authority to enact the ordinance, among others.  Id.  The West
Virginia Supreme Court of Appeals rejected the challenge and
held that the Fairmont ordinance was not preempted, in part
because it did not conflict with state or federal law, but

---

6    Although the state UIC program was promulgated under the
auspices of the Safe Drinking Water Act, the state program must
also comply with, among other laws, the WPCA.

primarily because of savings clauses in the federal and state statutes.  Id. at 484-87.

The Fairmont ordinance banned the operation of facilities used to permanently dispose of "hazardous wastes," as defined under the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. ("RCRA").  Under the RCRA, "hazardous wastes" are defined as wastes that may "cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment. . . ."  42 U.S.C. § 6903(5).  However, the RCRA includes a savings clause, which provides as follows:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator [of the EPA] or a State agency).

42 U.S.C. § 6972(f).  State law contains a related savings clause, which provides that, "[n]otwithstanding any provision to the contrary, and person may maintain an action to enjoin a nuisance against any permit holder" disposing of hazardous waste.  W. Va. Code § 20-5E-18(h).

The court held that those savings provisions "indicate[d] that Congress and [the] State legislature intended to preserve the rights of any person to file an action relating to hazardous wastes based on either statutory or common law grounds." 175 W. Va. at 485. Consequently, the court concluded that Fairmont had the authority to enact the ordinance because "a municipality has the authority to declare the improper permanent disposal of hazardous wastes a public nuisance." Id. at 487-88.

By contrast, drilling wastewater of the sort at issue here is exempted expressly from the requirements of the RCRA. See 42 U.S.C. § 6921(b)(2) ("[D]rilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas" are exempt from the definition of hazardous waste.). That said, such wastewater may be treated as "hazardous waste," for purposes of RCRA, if the EPA determines that such regulation is warranted. 42 U.S.C. § 6921(b)(2). To that end, the EPA found evidence of damage caused by natural gas and oil wastes, see 53 Fed. Reg. 25,446, 25,449 (July 6, 1988), including cases where wastewater harmed people or the environment even "where wastes are managed in accordance with currently applicable State and Federal requirements." Id. Nevertheless, EPA determined that its

41

regulation of oil and gas wastewater as "hazardous" waste was not warranted because of cost concerns, among other things. Id. at 25,447. Because wastewater has not been classified by the EPA as a hazardous waste, the Commission's reliance on the court's holding in Sharon Steel provides it little support.

The Commission's primary concern with respect to permanent wastewater disposal is the potential pollution of underground sources of drinking water. See Ordinance, pp. 1-2. However, wastewater properly injected into UIC wells pursuant to state and federal law does not become pollution simply because the Commission says so. The regulatory scheme demonstrates that, to the contrary, wastewater injection is a permitted -- if heavily regulated -- activity in West Virginia. Indeed, W. Va. C.S.R. § 47-13-13.16.b provides that a person with a UIC permit may not cause injury or "infringe" upon state or local law, yet avoid liability on the ground that the injurious conduct was done under a valid UIC permit. This subsection thus implicitly assumes that a UIC permit has been issued. The county cannot unilaterally prohibit conduct that federal and state law both expressly permit.

"Public health is a matter of statewide rather than local or municipal interest or concern and in the regulation of public health the power of the state is supreme." Syl. Pt. 5,

42

City of Huntington v. State Water Commission, 73 S.E.2d 833.
Consequently, "[i]n matters which do not concern the inhabitants
of a municipality alone, but which are of statewide interest or
concern, a municipality can be compelled to carry out the plans
of the state and to perform the duties which it imposes." Id.
at Syl. Pt. 6.

In the present context, the state of West Virginia has
concluded that oil and natural gas extraction is a highly
valuable economic activity subject to centralized environmental
regulation by the DEP.  To that end, plenary power over oil and
gas activities in the state is given over to the DEP.  See W.
Va. Code § 22-6-2(c) ("The [director of the DEP] shall have full
charge of the oil and gas matters" set out in articles 6, 6A, 8,
9, 10, and 21 of Chapter 22 of the state code.).  In the absence
of an express grant of authority to the contrary, or the
necessary implication of such authority flowing from an express
grant, the Commission cannot interfere with, impede, or oppose
the state's goals.  Consequently, the Commission lacks the power
to legislate in conflict with the state in this area.  Those
parts of the Ordinance that prohibit disposal of wastewater in
UIC wells conflict with and stand as obstacles to state law, and
hence are void.

43

### IV.   Conclusion

For the reasons set forth above, the court concludes that, as to those provisions which EQT has standing to challenge -- namely, (1) the ban on disposal of wastewater in UIC wells and (2) the regulation of storage at conventional vertical drilling sites -- the Ordinance is preempted by state and federal law.  The provisions of the Ordinance that permit county residents to bring civil enforcement actions against those in violation of the Ordinance, as well as the provision that disallows the use of state or federal permits in defense against an enforcement action, are likewise unenforceable as to the two provisions first above.

Consequently, it is ORDERED that the motion for summary judgment, deemed filed by plaintiff EQT Production Company on May 6, 2016, be, and it hereby is, granted to the extent set forth above.  The Commission's motion for summary judgment deemed filed on May 20, 2016, is correspondingly denied.  Remaining is the receipt of such further evidence as may be meet on the issue of EQT's entitlement to permanent injunctive relief, specifically with respect to irreparability of harm, inadequacy of a remedy at law, the balancing of hardships, and the public interest.

44

The Clerk is requested to transmit copies of this

order to all counsel of record and any unrepresented parties.

DATED: June 10, 2016

John T. Copenhaver, Jr.
United States District Judge